We have one more case to be argued. U.S. v. Saha Chasser. I appease the court. My name is Joel Stein. I appear for the appellant, Sangram Roy Sahacharsari. Three years after the verdict in this case, the government apparently had an epiphany and decided that after the three years of arguing that the special agent's testimony was permissible, decided that it was not, but nevertheless there was harmless error because of the other evidence that the government presented at the trial. What the government fails to do by either minimizing or ignoring the effect of the FBI special agent's testimony is fatal to their argument that there was harmless error in this case. The standard of review for harmless error, as Judge Walker himself discussed in United States v. Ducagini and United States v. Garcia, which is noted at page 10 of my brief, that in order for an error to be harmless, there has to be a substantial and injurious effect or influence on the jury's verdict. And upon review of the entire record, the court must be sure that the errors did not influence the jury or had a very slight effect. Now, the case agent in this case, Kurt Dangler, the FBI agent, had 15 years of experience as a FBI agent. Seven of those years he spent a good deal of time investigating this particular case. And with his vast experience as an FBI agent, 15 total years, and a portion of seven years investigating this case, that created an aura of special reliability and trustworthiness which must have impacted the jury. So what actually happened? Roberts. What about all the admissible evidence, the testimony of the two cooperators, the many recordings, the e-mails? They were all pretty incriminating. Well, to some extent, yes, although I would quarrel with whether or not they were all incriminating. Many of them were incriminating. Well, that is part of the government's case. There's no doubt about it. But Special Agent Dangler's testimony was not just some passing reference. It's 45 pages in the record testifying about how he determined that my client was a quote, promoter, and an organization that he was affiliated with was a so-called nominee entity. Now, these are not abstract, neutral terms. They have to be understood as Special Agent Dangler testified to during his testimony. Those designations, promoter and nominee entity, have to be understood in the context of what he expressly testified to, which was that based upon his experience and the information that he had gathered during a substantial investigation, that there was a widespread international scheme. Those are his words. The word scheme, which is a statutory element of the fraud charges that my client was charged with, he testified to or the prosecutor in his questions 19 different times. Roberts. I can understand your dissatisfaction with Dangler's testimony, and that's what you've been talking about. But is there any realistic possibility the verdict would have been different, given what the accomplice has said and all the other evidence, as Judge Chin has pointed out? Yes. The reason is because after the initial government witness, which was an expert witness, testified from FINRA about various trading, Agent Dangler was the next witness to testify. He testified for days. I'm assuming Dangler didn't testify or that he testified completely within bounds. Is there any realistic possibility the verdict would have been different? Yes. Because the jury must have been impacted by what he said about my client and the entity that he was affiliated with. That doesn't answer the question. The question is to subtract Dangler from the equation and look at the evidence that existed independently. Well, you can't. You have to look at that. You can't artificially just eliminate his testimony when it preceded for days, I think, his entire testimony. The jury believed the jury's relied to some degree on Dangler. That doesn't answer the question. It answers the question. The only answer to the question has to be what would be the situation if Dangler had not given this testimony, the improper parts of the testimony. I think you're asking a jury to perform an impossible task, which is not to be influenced by all the prejudicial information that they heard Dangler testify to. You're saying they wouldn't be influenced by the accomplices. Well, the accomplices — okay, let me deal with the two accomplice witnesses who testified, Joseph Manfredonia and Mohamed Dola. Mohamed Dola, I think, at this point in this case, had pleaded guilty to his third fraud conviction. During the course of one of his previous convictions, he testified at the trial and admitted at the trial of this case that he perjured himself during his testimony at that other case. Joseph Manfredonia, the other cooperating witness, testified also that he had been involved in numerous frauds. And indeed, Manfredonia testified that he never met my client. As to the tape recordings, I can't, obviously, within this time, talk to you about how 50-something recordings that the government played, that they can be interpreted in different ways. Obviously, the recordings would have had an impact on the jury's evaluation of the evidence in this case. But the point is — And they would have corroborated Dola. The recordings? Yeah. Well, to some extent, perhaps, yes. But to the extent that they were subject to different interpretations, then the answer is no. Okay. Now, there were other things that Dengler testified to which this Court cannot ignore. He testified that there was manipulation. He and the prosecutor injected those words in six different times into the record. He testified about corrupt brokers and kickbacks. Not only did that have nothing to do with my client, there was no evidence of it. Now, this was a purpose, supposedly for the purpose of case presentation. And what it did is it usurped the jury's function by allowing the agent to, in effect, declare my client guilty and usurp the jury's function. The government's brief, 8,278 words, did not mention in all those words the words good faith, which was my client's defense at the trial of this case. And that's what I addressed in my reply brief. So they've argued there was all this other evidence, the tape recorders, the cooperators, and they completely disregarded the affirmative evidence that was presented in this case of my client's good faith, evidence which is ---- The recordings, there were recordings of your client talking and saying things that substantially undercut whether he was acting in good faith. Well, but you could argue, certainly that is an interpretation. But there was other affirmative evidence that he acted in good faith, which was, in effect, negated by the district court judges allowing this very prejudicial testimony. There was affirmative evidence. An employee testified in a videotaped deposition about how he attempted to corroborate all the information. The press releases, which he ---- which my client did not create, he didn't disseminate to the world. His ---- the company's website that there was testimony about disclosed everything. There were disclaimers that the government did not argue was ---- were inaccurate in any way or misleading. There were promotions on the company's website, which the government did not argue were erroneous or misleading in any way. So you can surgically try and remove, as your questions have asked, the testimony of Dangler, but put it in the context of the defendant, of Mr. Sahaysari's defense of good faith, for which there is affirmative, uncontradicted evidence in the record, this testimony, this egregious testimony that went on for almost ---- thank you. We'll hear from the government. ANDRE SPECTER I please the Court. My name is Andre Specter, and I represent the government on this appeal. We concede on the appeal that the government's questioning of a special agent strayed into impermissible areas. There were two areas in particular, inadmissible hearsay and an improper opinion testimony. The district judge sustained some of the objections, but not as to all the questioning. JUSTICE ALITO You fought, you guys fought pretty hard to get it in, right? ANDRE SPECTER We disputed the objections at trial. That's right, Your Honor. JUSTICE ALITO Yeah. I mean, it's kind of a neat trick to sort of fight hard to get it in, and then when you get the conviction, because you're saying you need it. Judge, we need this stuff. Got to get it in. It's permissible. And then after the conviction to come sort of crawling back here and say, no big deal, because although it was clearly error, we had lots of other evidence. So you didn't need it after all is what you're saying. ANDRE SPECTER We did not need it, Your Honor. JUSTICE ALITO But that's not what you told the district court, though, at the time. What you implied. ANDRE SPECTER I'm not sure we told the district court that we absolutely need it, but we should not have fought for this evidence to come in. I take your point, Your Honor. And it was certainly not intentional on our part to do so. I think — JUSTICE ALITO So you thought it wasn't hearsay, and you thought it was something other than opinion testimony? ANDRE SPECTER I think the prosecutor and the district judge agreed that it was appropriate testimony for a case agent. And that was clearly an error. The real disputed issue — JUSTICE SCALIA Error not just on the part of the district court. ANDRE SPECTER It was error by the prosecutor. JUSTICE SCALIA Error by the prosecutor. ANDRE SPECTER Absolutely. And the district court's error was caused by the prosecutor. JUSTICE SCALIA What does it take to take that — what does it take to get you to take that lesson back to the office? ANDRE SPECTER It's been taken back, Your Honor. And it will continue to be taken back. It is something that no prosecutor should do at trial. And, you know, there certainly have been cases — there are a handful of cases where other prosecutors have done so, and we learn from those cases. You know, the disputed issue at this trial, as the appellant pointed out, was knowledge, because he raised the good faith defense. And the appellant agreed that he was a stock promoter, but he said he engaged in the conduct in good faith. That he was just — he was not a knowing member of this conspiracy. That essentially is what this case came down to. And that's why at the heart of this trial were the damning recordings of the appellant and the testimony of two cooperating witnesses. That was the evidence the government stressed in summation, and that was primarily the evidence that Judge Vitaliano wrote was, quote, voluminous, comprehensive, and overwhelmingly incriminating. In comparison, the testimony that we admit was improper was isolated and not nearly as problematic as the type that this Court has identified in the past as requiring reversal. The agent did not, for example, interpret any coded conversations, did not provide expert testimony, and he did not explicitly opine on the appellant's state of mind. With regard to the cooperators, Judge Vitaliano heard their testimony, wrote that it was, quote, detailed, all-encompassing, despite vigorous cross-examination. He said that Dola — respect to Dola, he was a primary member of this conspiracy, and he laid out for the jury how he and the appellant and others committed the fraud. The appellant, Dola explained, helped us set the stock promotion. And in return, the appellant was paid with stock, in fact, millions of shares, splitting the stock shares down the middle. Dola testified that he had a completely open communication about the fraud with the appellant. That's covered in Appendix 306. The appellant, according to Dola, even provided the, quote, game plan for the pump-and-dump operation. It's covered in Appendix 303. And with regard to the recordings, Judge Vitaliano wrote that they put the defendant's roles, quote, front and center. These calls, according to the district court, captured the appellant engaging in nearly every facet of the conspiracy. Some of the calls we quote on pages 7 and 8 and 32 through 35 of our brief, and they're really as damning as they come, and in part because the other person on the line in those calls was Dola. And he was the one who asked a trial about those calls. And the calls themselves, and like in other cases where this error has come up, they didn't require decoding. They were explicit. One example is the appellant saying to Dola, quote, a little fluff is fine. I mean, a little more substantial than a new board of directors. In another call, Dola told the appellant that there were only, quote, 100,000 shares against us, and later said, we're all going to be getting out of stock between 70, 50 to 75 cents to as high as a dollar. And the appellant's response, beautiful. Call after call with Dola openly discussing stock manipulation, and Dola even asked the appellant, you're a team player when it comes to selling, right? And without hesitation, the appellant says, yeah. There were, in fact, two calls that completely contradicted the good faith defense, because the appellant could be heard suggesting bringing down the stock prices, for which there's no innocent explanation. In one of those calls, he says, these guys that I'm lining up, one of them had asked if we could bring it down a little bit. Another call, Dola tells the appellant, you know, bring it down a little bit and have the heavy volume. We could do that as well. And then he said — There's lots and lots of this evidence, which I agree is highly incriminating. What do we — I mean, do we just ignore the inadmissible evidence? I mean, how do we really analyze this? It's a — I submit a difficult analysis to do in every case where you have to analyze harmless error. We never hope to be in this position. I think one way you could go about it is if you read the summations. And if you read the government's summation, there's barely any reference to this inadmissible — to the testimony, to the agent's testimony. And I'm not sure there's any reference to the inadmissible portion of this testimony. Because what we did in summation is we played call after call. We even did that in rebuttal. And then we relied on the cooperator's testimony. So I think that is one way that we could go about analyzing whether this error was harmless. The other way is we could read the judge's opinion below, who presided over the trial and who spent most of the opinion talking about the cooperator's testimony and the recordings. But there was no concession of error before the district court? No, Your Honor. There was not. When it rolled, yeah. Your Honors, unless there are other questions, I'm happy to keep quoting the calls. But — We have them. We have them. Thank you, Your Honor. Thank you. We'll hear the rebuttal. Judge, Your Honors, in response to Judge Walker's appropriate question, what does the government take back to its office? The Dukajimi case, which I cited, which is Judge Walker's opinion, was in 2003. Just sitting here listening to Mr. Spector's argument, I counted approximately eight times that this kind of problem has been before this Court, in which there was egregious testimony, usually by a law enforcement agency, and the government is arguing harmless error, or if there was no objection, there was plain error. So the point is that the government has not gotten the message. Look, I hear your point, and I'm sympathetic. But, I mean, the standard is not, you know, how do we send messages? The standard is a pretty clear one, right? And so the error is harmless if it — unless it's highly probable that it didn't contribute to the verdict, right? The error is harmless if it's highly probable that it didn't contribute to the verdict. So we've got all this other evidence. And so I guess we have to determine whether, absent this improper testimony, the verdict would have been any different. And do we have a high degree of confidence that it wouldn't have been? Well, that's why you cannot surgically just remove this testimony. You have to put it in the context of how this may have impacted on the jury in evaluating the evidence in this case and the appellant's defense of good faith. Do you agree with the government's characterization of the summation, that is, it primarily relied on the recordings and didn't refer much, if at all, to the inadmissible evidence? I would agree with Mr. Spector that the government did not refer in its summation to some of Agent Dengler's improper testimony. But I disagree because there were a number of references in his summation concerning the Moneyline records, which was the other issue that I raised, that the appellant raised, that was improper. The agent testified about these Moneyline records, which are supposed to be a means to perpetrate the fraud. And there are three different references in the government's summation to the Moneyline records. Those were introduced through that witness or they were introduced separately? That's the point. The Moneyline records were never introduced, even though the government had them in its possession. They were produced as part of discovery. They weren't introduced into evidence. But Dengler was testifying extensively about the Moneyline records. And in the government's summation ---- One of the cooperators also testified extensively about how Moneyline worked. And that person was involved. Okay. Well, Joseph Manfredonia testified about those records. But his testimony about the Moneyline records, which were not introduced but testified about, was as erroneous as the agent's testimony was about the records, because the agent and Mr. Manfredonia both testified that this was a way that the participant's identity could be hidden, hidden, so that the fraud was able to be perpetrated. And that was actually not the case. In the appendix, pages 93 to page 114 and pages 119 to 121, there are records from Moneyline that they didn't introduce into evidence but were part of discovery, which specifically has my client's name numerous times. So contrary to what Manfredonia testified to ---- The defendant have offered the documents? Well, he could have, but a judgment ---- Chose not to? Well, because the government was arguing that these records were used to perpetrate the fraud, and it is not the defendant's obligation to introduce some evidence that their contending was used to perpetrate the fraud. That's true, but you keep hammering that the government didn't offer them. My only question is whether the defendant could have offered them. In a literal sense, yes. But that you can't take you cannot take it out of the context of what happened here is they it's true it's literally correct that the defendant could have offered these records into evidence, but what the government did about them besides eliciting the improper testimony is they exploited it in their summation by arguing that this was a very effective means of perpetrating the fraud that weren't traceable to the account holders, which is completely incorrect because my client's name is all over the records that are identified. Your point is it's not clear whether those references were to the agent's testimony, which was impermissible, or the cooperator's testimony, which would have been, was permissible, right? So the testimony about Moneyline was introduced at trial, correct? Correct. It was introduced through the agent's testimony and through one of the cooperating witnesses who never met my client. Right. But so the references to Moneyline were appropriate if they're based on the other witnesses' testimony. But the references were incorrect because the records in the appendix show that the testimony saying that this was a means of hiding the identity of the account holder was just incorrect because my client's name was not there. There was nothing to prevent that point from being made at the trial, that they were incorrect. During cross-examination or? You had the records. Well, that was the difficulty of being put in the position of introducing records that the government was claiming was used to perpetrate the fraud and then testifying about them in a very misleading or even erroneous way, which is what happened. Well, they didn't have to actually be introduced into evidence. They could have just been shown to the witness. They didn't do that. You could have. The defense could have.  When the government is arguing that these records were used to perpetrate the fraud, let them introduce the records and say whatever they want to about them. Okay. Well, you're entitled to your strategy. Thank you. We'll reserve decision. The final case is on submission. There were a couple of other motions also on submission. I'll ask the clerk to adjourn. Clerk to adjourn.